UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------x
ARKADIY RUBEZHOV,

                   Plaintiff,

  - against -

WYETH,

                   Defendant.
---------------------------------------x

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

08 CIV. 6320

JUDGE ROBINSON

Plaintiff, ARKADIY RUBEZHOV, by his attorneys, **KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**, alleges as and for his Complaint as follows:

### INTRODUCTION

1. This is an action for damages and equitable relief in which Plaintiff asserts that he has been discriminated against by virtue of his age and that the policies and practices of Defendant, Wyeth (referred to hereinafter as "Defendant" or "Wyeth") complained of herein, violate state and federal laws prohibiting discrimination based upon age.

2. Plaintiff, Arkadiy Rubezhov ("Plaintiff" or "Dr. Rubezhov" hereinafter), was sixty nine (69) years old (as of the filing of his administrative complaint), and began his employment with Wyeth in or about 1996. At all material times hereto, Plaintiff resides in the State of New York and was employed by Wyeth, located in Pearl River, NewYork.

3. Upon information and belief, Defendant Wyeth is a corporation with its principal place of business located at 5 Giralda Farms, Madison, New Jersey 07940. Wyeth maintains a major facility in Pearl River New York, and, upon information and belief, is authorized to conduct business in New York. At all material times hereto, Wyeth has been an employer within the meaning of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, and the New York Human

Rights Law, Section 296.

## JURISDICTION AND VENUE

4. The within action alleges violations, inter alia, of the Age Discrimination in Employment Act of 1986, 29 U.S.C. § 626 and the New York Human Rights law. The case is properly venued in this district because this is where the claim arose, where Plaintiff resides and where Defendant, Wyeth, does business pursuant to 42 U.S.C. § 2000e (f) (3) and 28 U.S.C. § 1391 (c).

## GENERAL BACKGROUND

5. Plaintiff worked for Wyeth from approximately 1996 to 2007, at which time, plaintiff was improperly terminated by Defendant.

## GENERAL PATTERNS OF DISCRIMINATION

6. The denials and abridgements of employment opportunities suffered by Plaintiff is not an isolated example of Wyeth's employment practices. In fact, the opposite is true. These policies are illustrative of the pervasive pattern of discrimination in employment opportunities that existed at Wyeth.

7. Defendant has pursued policies and practices on a continuing basis which have had the effect of pressuring older employees, particularly at the Pearl River facility, to retire involuntarily or be fired. Defendant's policies and practices both intentionally discriminate against older employees and have a disparate impact upon older employees. Such policies and practices include, without limitation:

a) Reliance upon unweighted subjective and arbitrary criteria in making evaluations, assignments, training, promotions and pay decisions;

b) Use of pretextual reasons and shifting "qualifications" and requirements for training, job opportunities and job security or continuation which are different for younger employees than

older employees;

 c) Intentionally discriminating against older employees as follows:

  i) failing and refusing to promote older employees on the same basis as younger employees to supervisory and senior management positions;

  ii) by using pretext to phase out or terminate older employees and replacing them with younger, less experienced employees;

  iii) by placing older employees in the in-house Performance Improvement Program ("PIP") in order to build a file against such employees which Wyeth management sought to remove from the Company while seeking to apply a facially "neutral" pretext to such act and/or by putting undue pressure on the employee to force such employee to leave.

 8. As a result of Defendant's discrimination, Plaintiff was improperly terminated from his position and suffered substantial losses in earnings, promotional opportunities and other employment benefits, suffered humiliation and embarrassment caused by stress and anguish, all to his damage in an amount according to proof.

 9. Defendant did the acts herein alleged, knowingly, systematically, maliciously, fraudulently, oppressively and/or recklessly and/or with wrongful intention of injuring Plaintiff and from an improper and evil motive amounting to malice and in conscious disregard of Plaintiff's rights. Plaintiff is entitled to recovery of punitive damages in an amount according to proof.

## FACTUAL BACKGROUND

 10. Dr. Rubezhov had been an employee of Wyeth for approximately ten years. Dr. Rubezhov has a doctorate of chemical science and served as a professor of chemical science. He has written over 100 research papers and had been directly responsible for approximately ten Wyeth patents. During the last year of his tenure at Wyeth, Dr. Rubezhov was involved in

substantial projects with a high degree of difficulty and priority, which required a superior level of qualifications, knowledge of the subject, and professional skills. In addition, Dr. Rubezhov delivered at least seven important products to Wyeth. Dr. Rubezhov is a Russian national. He speaks only halting English.

11. Dr. Rubezhov was 69 years of age (as of the filing of his administrative complaint). Despite having very favorable reviews from 1997 to 2005, in 2006, Wyeth management began applying pressure on Dr. Rubezhov by suddenly submitting pretextual reviews, which claimed his work was sub-par. In fact, however, Dr. Rubezhov was subjected to age discrimination by Wyeth in that he was unfairly subjected to standards not applied to others and to the Wyeth in-house PIP program in a manner designed to force him to retire or face termination.

12. Wyeth management utilizes its PIP program to build a file against those employees they seek to get rid of and, by placing such employee in the PIP program, Wyeth management hopes to present a facially "neutral" gloss for terminating the employee or putting undue pressure on the employee to leave. This program was used in that manner to unfairly and improperly terminate Dr. Rubezhov.

### The Alleged Deficiencies Claimed By Wyeth Were Clear Attempts At Pretextual Excuse For A Discriminatory Firing

13. During the period 1997 through 2005, Dr. Rubezhov's reviews were exemplary. A rating of "4" or "5" is above average and excellent. A "3" rating is equally acceptable and means that the employee is doing work at the appropriate level. A rating of "2" means there are deficiencies which need correcting. If such rating persists, the employee may be placed into the PIP program when his or her average rating for more than one year is at the level of "2".

## The Evaluations, 1997 Though 2005, Support A Strong Inference of Pretext

14. For the period 1997 through 2005, Dr. Rubezhov never received a rating of "2." His ratings were, respectively, "5"(1997); "5"(1999); "4" (2000); "4" (2001); "5" (2002); "3" (2003); "4"(2004); and "3" (2005). In 1997, the evaluator's summary stated:

> [Dr. Rubezhov's] synthetic work is carried out with diligence, commitment. Has worked exrea [sic] hours on several to meet project goals. Performs work in independ[ent] but capable manner. Most productive in group. . . .Safety– well kept working area.

15. In 1999, the Appraiser's Comments stated:

> Arkadit [sic] made major contribution to the SSRI/TT1a project and Hemiasterlin where he was instrumental in the purification and isolation of initial batches of both products. He was nominated by his peers for his efforts in the preparation of the highly potent/toxic Hemaisterlin, 35gr. He continued support of this project by doing the thankless and tedious mission of preparing reference materials. . . He is [s]trong scientist, who is skillful at the bench and does thorough literature background work on all projects.

16. In 2000, the Appraiser's Summary stated:

> "Most productive experimentator in the sroup [sic]. Has been very supportive and an unofficial mentor/tutor, has offered many innovative solutions to synthesis problems such as the spiro intermediate . . .which [a] year ago was deemed almost unsolvable"

17. That appraiser also cited Dr. Rubezhov for "high standards of performance" and noted that he "takes ownership" and "leeds [sic] by example, [and] takes responsibility for own development." That same appraiser noted with regard to "Respect for Others," that Dr. Rubezhov, "treats others as they woukld [sic] wish to be treated, respects other's esteem when

addressing problems."

18.  In 2001, the Appraiser's Summary stated: "Dr. Rubezhov has had another strong performance year. He is a pleasure for everyone in the group. He has developed difficult chemistry and has been able to support scale-up of this stuff [sic] . . . He is the most productive scientist in the group (and in department!)."

19.  In 2002, the Appraiser's Summary stated, under "Quality": "Careful and meticulous chemist. Willing to listen to suggestions and doesn't hesitate to try them out. Under "Integrity" it stated: "Follows through on all commitments; most productive experimentalist in the Department." Under "Respect for People" it stated: "Has been very supportive and mentor/tutor to newly hired inexperienced st[a]ff."

20.  In 2003, Dr. Blum, as Appraiser, stated: "All necessary actions were takrn [sic] with pesonal [sic] responsibility (Scientific results, safety, ties of delivery) and confidentiality."

21.  Under "Respect for People" Dr. Blum wrote of Dr. Rubezhov in 2003, that "while workng [sic] in team respects the other's contributions, trust co-workers, open for new ideas and mutual discussions." Under "Leadership," Dr. Blum stated he was "willing to work overtime" did "not need to be pushed and initiated" and "very easily accepts innovations and changes to organization."

22.  The overall summary of Blum stated: "Synthetic work is carried out with diligence and high commitment. Has worked extra hours on several to meet project goals. Performs work in independent but capable manner."

23.  In 2004, Dr. Blum noted that there were no safety citations, "work contributed to this year new important innovations" that "all chemistry was done with full responsibility without any intermediate supervision" and that he had "great team collaboration [sic], open to

new ideas, recognizes own and other contributors. Willing to work the second role if necessary." Dr. Blum gave Dr. Rubezhov a rating of "4."

24.  In 2005, Dr. Blum gave Dr. Rubezhov a "3" rating and noted that he "takes responsibility for fixing complex chemistry problems" and "[t]hese are communicated to team and group members." He stated Dr. Rubezhov's "quality of science is very good and striving for continuous improvement is evident." Under "Leadership," he stated Dr. Rubezhov demonstrated "intiativ [sic] with regrd to solving scientific problems and approaches the job with a passion and conviction."[1]

25.  Put succinctly, Respondent's own appraisals of virtually every aspect of Dr. Rubezhov's work performance was an admission that his work was of the highest quality, year after year. Indeed, Dr. Rubezhov's job was primarily based on knowledge and experience— which Wyeth's own appraisals admitted he clearly possessed in the highest degree. The 2006 appraisal intentionally and maliciously bumped him down to a "2" rating for the first time in his career at Wyeth, and precipitated the requirement that he submit to the PIP program. The 2006 appraisal was so out of sync with all previous evaluations as to be highly suspicious.

**The 2006 Review Is Highly Suspicious and Constituted Clear Pretext**

26.  The 2006 Review, which was designed to make Dr. Rubezhov submit to the PIP, was at great variance with every prior review and was clearly pretext. The review was written by James Farina, not David Blum, who had given Dr. Rubezhov mostly favorable assessments previously. Farina had not previously been Dr. Rubezhov's superior in 2006, had no direct

---

[1] While it is true that in 2005 Dr. Rubezhov, although given a thoroughly good review, did get a "2" on safety, about 75% of those in his department also received a "2" rating. The lower safety score was not the result of anything he had done.

responsibility for the work of Dr. Rubezhov in 2006 and had no direct, first-hand knowledge of his work in 2006. Moreover, he was not then working as a scientist "at the bench" as it were, but had long before come into a management position, far removed from the day to day work of a scientist.

27. Second, Plaintiff had made significant contributions on at least seven (7) projects during the year, which Farina's review either ignored or glossed over. Clearly, Farina's 2006 appraisal which set forth a "2" rating demonstrates that it did not review all of the seven projects he worked on that year. Nor did it discuss that, while working on these projects, he had made major contributions. The 2006 appraisal was clearly designed to push Plaintiff into the PIP program as a pressure tactic to remove him.

28. The PIP project which Dr. Rubezhov was given by Farina involved a substance which was exceedingly difficult, if not impossible, to produce. Indeed, earlier attempts to prepare this trans-isomer date back to 1965 and all of them were unsuccessful. This complex and much-challenged project took all of Plaintiff's attention and energy. Moreover, Dr. Rubezhov was saddled with meetings with Farina and then Karen Wiggins-Sutherland ("Sutherland"), which were designed to slow him down, ask questions (in person and by email) which were lengthy, time consuming, unnecessary and were intentionally designed to be difficult to address. Moreover, despite the fact that prior evaluations praised Dr. Rubezhov for good communication skills, good mentoring skills and an excellent teamwork approach, Sutherland and Farina unfairly attempted to portray Dr. Rubezhov as petulant, unwilling to help and unable to properly communicate to them or document his work to them. These efforts were intentionally designed to inaccurately and intentionally skew the perception of Plaintiff and create an improper, inaccurate and negative view of Dr. Rubezhov.

29. In April 2007, Dr. Rubezhov went to Mike Kolb, Vice President, and Mike O'Brien, Assistant Vice President to talk about the unfairness of the evaluation of his performance. They both assured him that the PIP was only a formality and that he would pass it and continue working. However, Farina, who supervised his PIP and was in charge of grading him in the PIP told him during the grading process, "Your time is gone" and "You don't fit the new paradigm." These statements revealed an underlying discrimination against Plaintiff which was related to and/or based upon his age.

30. His mandated PIP term was supposed to end by May 15, 2007. Dr. Rubezhov believed he was doing well in the PIP.

31. However, on or about May 9, 2007, Sutherland called him into her office and declared that he was going to fail the PIP. Sutherland told him he must resign or he will be terminated. She told him, if he was terminated, he would lose his right to vacation pay and to his pension (while this latter threat was untrue, Plaintiff did not know that at the time). Dr. Rubezhov told her he did not want to retire and he needed to speak with his wife, (who also worked at Wyeth in a different department). Sutherland then called his wife and told her to come to her office immediately, telling her that her husband needed to speak with her. She refused to say why. Mrs. Rubezhov came over immediately, concerned that there was some emergency. Dr. Rubezhov explained to Mrs. Rubezhov that he did not pass the PIP and he must retire or they will fire him and that he would lose his pension and (unused) vacation days. Sutherland was present during this discussion. Mrs. Rubezhov asked Sutherland if this couldn't be done in a more civil and less pressured way. Sutherland stated she could not speak to her but only to Plaintiff directly about it. Mrs. Rubezhov asked him, in the presence of Sutherland, if he would not get his pension if he was fired. He stated that was what he was told. Sutherland was present

eventually removed.

36. On or about June 29, 2007, Dr. Rubezhov was instructed to attend an exit interview with Kathy Young. At the interview he was instructed to return the Company belongings in his possession, including his corporate credit card and company ID badge, (which is a magnetic entrance key to Wyeth's employee entrance). He did as requested and signed the exit checklist. Kathy Young also signed it and gave a copy to Dr. Rubezhov. This checklist also indicated his unused vacation time. He was handed a Separation Agreement at that time ("Agreement") and asked to sign and return it within 21 days.

37. Since his access key/ID badge was taken away from him on June 29, 2007, Dr. Rubezhov was not be able to enter the Company premises after the exit interview. In fact, his user name and password did not work when he wanted to check his pension calculator. He was prevented from checking his payroll history as well. Dr. Rubezhov's payroll was stopped, as of on or about July 31, 2007, and he has received no checks after that date.

38. After further reviewing the forced separation agreement, Dr. Rubezhov refused to sign it or to release all of his potential claims. When Wyeth was informed of this, the Company suddenly took a different tact and claimed he was never discharged, constructively or otherwise, but claimed, illogically, that he "voluntarily retired." When Plaintiff asserted that he was discharged by the Company and subjected to a forced separation, Wyeth sent a letter via email on September 12, 2007 to Plaintiff's counsel, claiming he "voluntarily" retired and if he wanted to return to work, he could do so, but he must report to Wyeth's Pearl River facility by September 13, 2007, a Jewish holiday (Mr. Rubezhov is Jewish). Such a pretext is transparent. The Company clearly terminated Dr. Rubezhov, as he was instructed to submit to an exit interview, instructed to return all of his company materials, asked to sign a separation agreement, lost

access to computer entry, and informed his last day of work would be on or about July 31, 2007.

39.　In fact, Dr. Rubezhov, in a show of good faith, (and to demonstrate that Wyeth was simply asserting its position as mere pretext), did show up on September 13th notwithstanding the fact it was a Jewish holiday. The receptionist checked his name on the computer and found it was not there. They also had no ID Badge for him. He asked to see Sutherland. While Sutherland failed and, upon information and belief, refused, to come out to see him, the receptionist gave him a sticker badge which stated "former employee." Dr. Rubezhov waited for approximately 30 minutes, and was eventually seen by Kathy Young.

40.　Dr. Rubezhov told her he was told to report back to work and showed Ms. Young the letter from Wyeth's counsel making that assertion. Ms. Young was extremely puzzled and said he could not come to work at that time and asked him what he planned to do. He said he was not available for the next two days of the Rosh Hashanah holiday. Ms. Young said if he did come back, he would be placed back into the PIP program, which would lead to his termination.

41.　Plaintiff, having been rebuffed, left the premises.

42.　Plaintiff has suffered damages amounting to loss of his position and loss of back wages, front pay, various benefits and other compensatory damages, damages for emotional distress and physical injury. Complainant also believes he was retaliated against when he raised the issue of discrimination.

### FIRST CLAIM
### (Violation of Title 29 U.S.C. Sec. 621, Et Seq. "ADEA")

43.　Plaintiff incorporates paragraphs 1 through 42 above.

44.　Plaintiff filed a claim with the New York State Division of Human Rights on or about February 25, 2008, and said claim was dual-filed with the Equal Employment Opportunity

Commission ("EEOC") within the requisite time period. Plaintiff has commenced this action in a timely manner. Plaintiff has exhausted his administrative remedies and fulfilled all conditions precedent to bringing an action under 42 U.S.C. § 2000e et seq.

45. Plaintiff seeks an award for appropriate economic loss, emotional and mental distress, including compensatory damages, liquidated damages, punitive damages and appropriate injunctive and equitable relief.

46. Plaintiff was discriminated against by Defendant and was pressured by a variety of unfair practices as aforementioned, including threats of termination and termination, which were applied to him because of his age.

47. Defendant's practices as aforestated are in violation of the Age Discrimination in Employment Act Title 29 U.S.C. § 621, et seq.

48. Defendant's acts alleged herein have caused Plaintiff pain and suffering, humiliation, degradation, and constitute outrageous conduct and/or were engaged in reckless disregard of the ADEA, permitting recovery of liquidated damages.

49. Plaintiff seeks an award for appropriate economic loss, emotional and mental distress, including compensatory, liquidated damages, punitive damages and appropriate injustice and equitable relief.

## SECOND CLAIM

### (Violation of New York State Human Rights Law Section 296)

50. Plaintiff incorporates paragraphs 1 through 49 above.

51. The New York State Human Rights Law, Section 296, makes it unlawful for an employer to engage in a discriminatory practice because of age, including but not limited to discrimination in compensation, terms, conditions or privileges of employment and/or the refusal

to continue the employment of and/or to terminate an employee, as a result of age discrimination.

52. Defendant is an employer subject to the New York Human Rights law aforementioned.

53. The acts and conduct engaged in by Defendant aforestated, including the discrimination in the terms, conditions and/or privileges of employment, the pressure upon Plaintiff to forceably retire or be fired, and/or the refusal to continue the employment of and/or the termination of employment by Defendant, due to Plaintiff's age, constitute discrimination in violation of Section 296 of the Human Rights Law.

54. Plaintiff seeks an award for appropriate economic loss, emotional and mental distress, including compensatory damages in excess of $2,000,000.00, liquidated damages, punitive damages and appropriate injunctive and equitable relief.

55. By virtue thereof, Plaintiff has been injured in a sum to be determined by the trier of fact in excess of Two Million ($2,000,000.00) Dollars and also seeks remedial injunctive relief.

### THIRD CLAIM
### (Retaliation)

56. Plaintiff incorporates paragraphs 1 through 55 above.

57. Retaliation against one claiming age discrimination is prohibited under the ADEA, 29 U.S.C. Section 623(d) and under the Human Rights Law, Section 296, Subd. 3-a(c).

58. Subsequent retaliation was inflicted upon Plaintiff, to the injury of Plaintiff. For example, Dr. Rubezhov was entitled to payment for accrued and unused vacation time, owed to him by defendant. Subsequent to Plaintiff making the discrimination claim, Wyeth refused to pay Plaintiff despite the admission by one of its employees that Plaintiff should receive that

payment. In addition, Respondent has retaliated by sending to Dr. Rubezhov a false W-2 which falsely attributed to him $11,984.36 in income which he never received. Had Dr. Rubezhov not caught this discrepancy, he would have been required to pay additional taxes for money never received. Eventually, only after Plaintiff's continued insistence that it be changed, did Wyeth issue an amended tax form.

59. In addition, Defendant failed and refused to authorize certain payments to be made from the medical insurance plan which covered Plaintiff and his family, causing Plaintiff severe emotional and mental distress and humiliation.

60. As a result thereof, Plaintiff has been injured by the retaliation of Defendant and demands judgment therefore.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests the following relief:

I. That Plaintiff be awarded back pay, front pay, liquidated damages, general and special damages for lost compensation and job benefits that he would have received but for the discriminatory practices of Defendant, and for emotional distress, humiliation, embarrassment, and anguish according to proof all in excess of Two Million Dollars ($2,000,000.00);

II. That Plaintiff be awarded punitive damages according to proof and as allowed by law;

III. That Defendant, Wyeth, be ordered to institute and carry out policies, practices, and affirmative action programs which provide equal employment opportunities for older employees in its corporation and which eradicate the effects of its past and present unlawful employment and promotion practices;

 IV. That Plaintiff be given the equivalent pay, wage rates, benefits and seniority rights which represent the same at the level which he would be enjoying but for the discriminatory practices of Defendant;

 V. Reasonable attorneys and expert fees and costs of suit;

 VI. Pre-Judgment interest; and

 VII. Such other and further relief as the Court may deem just and proper.

**TRIAL BY JURY DEMANDED**

Plaintiff hereby demands a Trial by Jury.

Dated: Chestnut Ridge, New York
    July 10, 2008

             KANTROWITZ, GOLDHAMER
             & GRAIFMAN, P.C.

             By: _____
               Gary S. Graifman, Esq.
             **Attorneys for Plaintiff**
             747 Chestnut Ridge Road
             Chestnut Ridge, New York 10977
             (845) 356-2570